UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ISIAH O. SMITH,

        Petitioner,

v.                                          Case No. 18-cv-666-pp

CHRIS BUESGEN,[1]

        Respondent.

---

### ORDER DISMISSING PETITION FOR WRIT OF *HABEAS CORPUS* (DKT. NO. 1), DISMISSING CASE WITH PREJUDICE AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY

---

On April 27, 2018, the petitioner, who is incarcerated at Stanley Correctional Institution and is represented by counsel, filed a petition for writ of *habeas corpus* under 28 U.S.C. §2254 challenging his 2013 conviction in Milwaukee County Circuit Court for second-degree reckless homicide as a party to a crime. Dkt. No. 1.

Because the Wisconsin Court of Appeals did not unreasonably apply federal law as determined by the United States Supreme Court, the petitioner is not entitled to *habeas* relief. The court will deny the petition and dismiss the case.

---

[1] Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts says that if someone is currently in custody under a state-court judgment, "the petition must name as respondent the state officer who has custody." Because the petitioner is in custody at Stanley Correctional Institution, the court has substituted warden Chris Buesgen as the respondent.

1

## I. Background

### A. State Case

#### 1. *Trial in Milwaukee County Circuit Court*

The Wisconsin Court of Appeals recounted the factual background of the petitioner's conviction:

> On March 8, 2013, [the petitioner] was charged with first-degree reckless homicide, as a party to a crime, with the use of a dangerous weapon. The charges stemmed from the shooting death of Marcell Alexander. According to the criminal complaint, Alexander was shot in the hallway of his apartment building on the night of March 4, 2013. Video surveillance from the apartment building showed [the petitioner] and Unquail Kennedy, a co-actor, enter the apartment building shortly before the shooting and then exit minutes later. The complaint alleged that the surveillance video showed Kennedy leaving the building with a cell phone in one hand and a gun in the other. [The petitioner] is shown exiting with a cell phone in hand. The complaint further alleged that Alexander's girlfriend, T.T., found Alexander after he had been shot. T.T. told police that Alexander identified his shooters as "the niggas from 38th street." T.T. also identified [the petitioner] and Kennedy from the surveillance video, telling police that she knew them. The complaint states that following the shooting, Alexander was rushed to Froed[t]ert Memorial Lutheran Hospital, where he died. Doctors at Froed[t]ert confirmed that Alexander died as a result of a gunshot wound.

Dkt. No. 8-5 at ¶2.

T.T.'s trial testimony indicated that "on the night of March 4, 2013, she was sleeping in the apartment that she shared with Alexander." Id. at ¶4. She stated that after 10:20 p.m., one of Alexander's friends came into T.T.'s bedroom and said "get up, get up. [Alexander] got shot." Id. T.T. testified that she found Alexander lying in the hallway outside of their apartment. Id. She testified that Alexander identified his attackers as "the little niggers off 38th." Id. "T.T. also testified that she found a cell phone near Alexander that did not

2

belong to him. She turned the phone over to police." Id. T.T. testified that after reviewing "surveillance video covering the area outside of the apartment and the apartment's entryway," she "identified [the petitioner] and Kennedy" and explained that they "[were] associated with the area of 30th and Wright Streets in Milwaukee, but 'hang' on 38th Street." Id. at ¶5.

Milwaukee Police Detective Shannon Lewandowski testified that she obtained surveillance video the night of the shooting. Id. at ¶6.

> As the jury was shown the video, Lewandowski walked the jury through the contents, explaining that the video showed the alley behind the apartment complex and the back entrance into the complex. Lewandowski explained that the video shows an SUV pulling into the alleyway with its lights on. Because the surveillance camera was motion-sensored, Lewandowski explained, she did not see anyone exit the vehicle. However, "two people all of a sudden appear after that vehicle pulls up. [The car's] lights get turned off and the two individuals are now walking along [a] fenced area ... along the sidewalk." The video jumps to Alexander letting the two individuals into the apartment. The video then jumps to Alexander and the two individuals, whom Lewandowski identified as [the petitioner] and Kennedy, in the apartment entrance and shows them walking towards a hallway before going out of view. The video is timestamped, showing that the individuals entered the apartment at 10:23:07 p.m. Approximately fifty seconds later, the video jumps to [the petitioner] and Kennedy exiting the building. Kennedy is holding a firearm and a phone, while [the petitioner] is holding a phone. The video then shows Kennedy getting into the rear driver's side of the SUV and [the petitioner] getting into the passenger side. Lewandowski was unable to determine whether [the petitioner] entered the front or rear passenger side, but stated that neither [the petitioner] nor Kennedy entered the driver's seat in the SUV, suggesting that another person was driving. The car then drove away.

Id.

L.M.—the petitioner's girlfriend—also testified. Id. at ¶7. She stated that at midday on March 4, 2013, she and the petitioner went to her cousin's

3

house, and "that later that evening she went to dinner while [the petitioner] and her cousin remained at the cousin's home." Id. "L.M. left her car—a Ford SUV—at her cousin's home, with the keys." Id. "[W]hen she returned . . . at approximately 9:30 p.m., neither her cousin nor [the petitioner] was there, and her car was gone." Id. With the petitioner, her cousin and her car still gone, L.M. fell asleep at about 10:30 p.m. Id. In the middle of the night, L.M. awoke "and saw through a window that her car was back." Id. "L.M. told the jury that [the petitioner] had also returned by the time she woke up." Id. After L.M. asked the petitioner why he had not called her, the petitioner responded that "he either lost or broke his phone." Id. Finally, "Milwaukee Police Detective Doreen Ducharme, a detective within the High Technology Unit, testified that a cell phone with a cracked screen was left at the scene of the shooting." Id. at ¶8. Forensic testing indicated that the phone belonged to the petitioner. Id.

On August 5, 2013, the jury found the petitioner guilty of second-degree reckless homicide as a party to a crime. State v. Smith, Milwaukee County Case No. 2013CF001154 (available at https://wcca.wicourts.gov). On October 28, 2013, the court sentenced the petitioner to fifteen years of initial confinement followed by ten years of extended supervision. Dkt. No. 1 at 2. The clerk entered the judgment of conviction the following day. Id. On May 27, 2015, the petitioner filed a motion for a postconviction relief under Wis. Stat. §809.30. Smith, Milwaukee County Case No. 2013CF001154 (available at https://wcca.wicourts.gov). Nine weeks later, the court denied the motion.

### 2. *Wisconsin Court of Appeals Decision*

On August 10, 2015, the petitioner filed a notice of appeal. Dkt. No. 1 at 3. On appeal, the petitioner argued that the evidence was insufficient to support his conviction for second-degree reckless homicide, the trial court erred in denying his request for a "mere presence" instruction and trial counsel was ineffective for allowing a juror who expressed fear of retaliation in the event of a guilty verdict to remain on the panel. Dkt. No. 1-3 at ¶14. On November 15, 2016, the Wisconsin Court of Appeals affirmed the trial court's judgment and denial of the petitioner's Wis. Stat. §809.30 postconviction motion. Id. at 1.

The court of appeals concluded that there was sufficient evidence to support the jury's verdict. Id. at ¶23. It recalled that state law allowed the jury to find the petitioner guilty of second-degree reckless homicide as a party to a crime under two "theories" of party-to-a-crime liability. Id. at ¶¶18-19. The State needed to show that the petitioner either directly committed the crime of second-degree reckless homicide (the direct actor theory) or that the petitioner aided and abetted in the commission of the crime (the aiding and abetting theory). Id. at ¶18 (citing State v. Howell, 301 Wis. 2d 350, 363 (2007)); see also id. at ¶¶19-21. The court found that under the statute, neither the direct actor nor aiding and abetting theories of party-to-a-crime liability required the petitioner's advance knowledge of the unreasonable and substantial risk the conduct created. Id. at ¶¶19-21. It observed that "[t]he elements of second-degree reckless homicide are: (1) the defendant caused the death of the victim; and (2) the defendant caused the victim's death by criminally reckless

conduct." Id. at ¶18 (citing WIS JI—CRIMINAL 1022). State law defined criminal reckless conduct as "action that 'creates an unreasonable and substantial risk of death or great bodily harm to . . . another and the actor is aware of that risk.'" Id. (citing Wis. Stat. §939.24). State caselaw provided that "[t]he actor's awareness is the actor's subjective awareness at the time of the conduct—not the actor's subjective awareness either before or after the conduct." Id. (citing State v. Neumann, 348 Wis. 2d 455, 521 (2013)).

The court rejected the petitioner's remaining claims, concluding that the trial court did not err in refusing to give a particular jury instruction, id. at ¶28, and the petitioner's counsel was not ineffective in failing to remove the juror, id. at ¶¶29-32. On December 15, 2016, the petitioner filed a petition for review in the Wisconsin Supreme Court. Dkt. No. 8-6. Two months later, the court denied review. Dkt. No. 8-8.

B. Federal *Habeas* Petition

On April 27, 2018, the petitioner filed this federal *habeas* petition. Dkt. No. 1. The petition asserted one ground for relief: that the evidence was insufficient to support the petitioner's conviction for second-degree reckless homicide as a party to a crime. Id. at 14. On January 17, 2019, the court screened the petition and allowed the petitioner to proceed on that ground. Dkt. No. 5. On August 8, 2019, the petitioner filed a brief in support of the petition. Dkt. No. 26. The petitioner argues that the State failed to present evidence that he directly committed or aided and abetted the commission of the reckless homicide. Id. at 7. He states that the Wisconsin Court of Appeals'

6

Case 2:18-cv-00666-PP   Filed 11/30/21   Page 6 of 15   Document 43

decision "was an objectively unreasonable application of the federal due process requirement that the prosecution present sufficient evidence to prove every element of the crime beyond a reasonable doubt." Id. at 9. On December 12, 2019, the respondent filed a brief in opposition to the petition asserting that the court of appeals reasonably applied federal law. Dkt. No. 34.

**II.    Analysis**

    A.    Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, a federal court may grant habeas relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Miller v. Smith, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. §§2254(d)(1), (2)). A federal *habeas* court reviews the decision of the last state court to rule on the merits of the petitioner's claim. Charlton v. Davis, 439 F.3d 369, 374 (7th Cir. 2006).

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Renico v. Lett, 559 U.S. 766, 773 (2010) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable."

7

Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (emphasis added). In other words, §2254(d)(1) allows a court to grant *habeas* relief only where it determines that the state court applied federal law in an "objectively unreasonable" way. Renico, 559 U.S. at 773. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 102 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standard under §2254(d) is 'difficult to meet' and 'highly deferential.'" Saxon v. Lashbrook, 873 F.3d 982, 987 (7th Cir. 2017) (quoting Cullen v. Pinholster, 563 U.S. 170, 181 (2011)).

B. Sufficiency of the Evidence

"The applicable Supreme Court precedent regarding the sufficiency of the evidence is well established: 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Saxon v. Lashbrook, 873 F.3d 982, 987-88 (7th Cir. 2017) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

> [H]abeas reviews of *Jackson* claims are subject to two levels of judicial deference creating a high bar: first, the state appellate court determines whether any rational trier of fact could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable.

Id. (citing Coleman v. Johnson, 566 U.S. 650, 651 (2012)).

A federal court analyzes the sufficiency of the evidence supporting a state criminal conviction by looking to the substantive elements of the underlying

8

criminal offense. Jackson, 443 U.S. at 324, n.16 ("the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.") The jury found the petitioner guilty of second-degree reckless homicide as a party to a crime in violation of Wis. Stat. §§940.06(1) and 939.05. Dkt. No. 8-1 at 1. Under Wis. Stat. §940.06(1), "[w]hoever recklessly causes the death of another human being is guilty of a Class D felony." Under Wis. Stat. §939.24, "'criminal recklessness' means that the actor creates an unreasonable and substantial risk of death or great bodily harm to another human being and the actor is aware of that risk."

Wis. Stat. §939.05 discusses liability for a party to a crime; the statute provides, in relevant part,

> (1)  Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.
>
> (2)  A person is concerned in the commission of the crime if the person:
>
>   (a)  Directly commits the crime; or
>
>   (b)  Intentionally aids and abets the commission of it[.]

In its decision affirming the petitioner's conviction, the Wisconsin Court of Appeals stated that the verdict was reasonable under either subsection of Wis. Stat. §939.05(2). Dkt. No. 8-5 at ¶¶18-19. Under the direct actor theory, the court found that there was sufficient evidence showing that "[the petitioner] and/or Kennedy: (1) caused Alexander's death (2) by criminally reckless

9

conduct." Id. at ¶20. Citing the surveillance video and the petitioner's recovered cell phone, the court found explained,

> [t]he evidence presented at trial establishes that Alexander was shot at close range during the one-minute time period when [the petitioner] and Kennedy were in Alexander's apartment building. It is undisputed that Alexander ultimately died as a result of that wound. [The petitioner] and Kennedy were present at the victim's apartment complex minutes before the shooting. Surveillance video showed two men, identified by witnesses as [the petitioner] and Kennedy, entering the building at 10:23 p.m. The men were let into the building by Alexander, who is also seen on the surveillance video at 10:23 p.m. One minute later, the video showed [the petitioner] and Kennedy leaving the building—Kennedy had a gun in his hand. The video captured the men leaving in an SUV, which, according to witness testimony, [the petitioner] had access to. A cell phone found at the scene of the shooting was identified as [the petitioner's] phone. The jury could draw only two conclusions from this evidence: either [the petitioner] shot Alexander, or [the petitioner] was present when Kennedy shot Alexander.

Id. The court stated, "[e]ither way, the evidence is clear that the conduct created an unreasonable and substantial risk to Alexander and the jury could conclude that [the petitioner] was aware of the risk." Id.

As to the aiding and abetting theory, the Court of Appeals concluded that

> [t]he jury was entitled to infer from [the petitioner's] conduct that he intended to assist Kennedy in the commission of *a* crime and also that [the petitioner] participated in the commission of the crime himself because the jury could reasonably infer that [the petitioner] arranged for the getaway car (owned by his girlfriend) and a driver (his girlfriend's cousin). [The petitioner] had access to an SUV. L.M. testified that: she and [the petitioner] were at her cousin's home on the day of the shooting; she went to dinner but left her car and its keys at her cousin's house; when she returned at 9:30 p.m., her car, [the petitioner], and her cousin were gone; and when she awoke in the middle of the night, her car and [the petitioner] had returned. Surveillance video shows: an SUV pulling up in the alleyway behind the apartment complex; [the petitioner] and Kennedy getting out of the SUV and entering the apartment complex; the SUV's headlights and brake lights turning off; [the petitioner] and Kennedy emerging from the apartment complex about one minute after they entered,

10

> with Kennedy holding a gun; the SUV's headlights and brake lights coming back on before [the petitioner] and Kennedy reached the vehicle; and neither [the petitioner] nor Kennedy entering the driver's seat, but the SUV driving away.

Id. at ¶22. Observing that "it is the jury's function . . . to resolve conflicts in testimony, draw inferences, and determine whether the evidence presented satisfies it beyond a reasonable doubt that the charged crime was committed," the court concluded that there was a "reasonable hypothesis from the evidence presented that supports the guilty verdict." Id. at ¶23.

The petitioner argues that the evidence was insufficient for the jury to find him guilty of second-degree reckless homicide either as a direct actor or as aiding and abetting Kennedy. Dkt. No. 26 at 7, 10. He says that "[t]here was no direct evidence showing that [the petitioner] himself fatally shot and killed Alexander," and that "there was no direct evidence presented to reflect what happened inside the apartment complex other than that [the petitioner] and Mr. Kennedy were seen entering the building, after Alexander let them in, and, shortly thereafter, running away from the building, and that Alexander was shot." Id. at 8. According to the petitioner, "reasonable inferences from the circumstantial evidence presented failed to prove beyond a reasonable doubt that [the petitioner] shot and killed Alexander." Id. The petitioner asserts that "[b]eing with Mr. Kennedy, including entering and exiting the building with him, even with Kennedy holding a gun upon exiting, and [the petitioner's] cellphone located at the shooting scene, is insufficient speculative evidence and not enough to prove beyond a reasonable doubt that [the petitioner] shot and killed Alexander;" he urges that "[s]uspicious behavior or suspicion that [the

11

petitioner] may have witnessed the killing, is not sufficient evidence to sustain his conviction as having had directly committing the homicide." Id. at 9.

Regarding the aiding and abetting theory, the petitioner contends that a rational jury could not conclude that the petitioner knew that Kennedy intended to commit second-degree reckless homicide. Id. at 12. The petitioner reasons that "[t]he State presented no direct evidence that [the petitioner] had any knowledge that Mr. Kennedy would be or was committing a homicide." Id. He argues that "the State asked the jury to stack inference upon inference" to meet its burden. Id. at 13.

The respondent asserts that the court of appeals reasonably applied federal law when it rejected the petitioner's insufficiency of the evidence claim. Dkt. No. 34 at 12-14. The respondent contends that under the direct actor theory, "the jury reasonably could have inferred that (1) [the petitioner] and Kennedy provoked a physical struggle with Alexander in the apartment hallway that evening, and (2) either [the petitioner] or Kennedy handled a gun during this encounter." Id. at 15-16 (footnote omitted). He asserts that "[f]rom that, the jury could have reasonably concluded that [the petitioner] created an unreasonable and substantial risk of death or great bodily harm to Alexander, regardless whether [the petitioner] possessed the gun at the time of the struggle," and that the petitioner did so knowingly. Id. at 16.

The respondent argues that under the aiding and abetting theory, even if the jury believed that Kennedy alone committed second-degree reckless homicide, it could have convicted the petitioner if it concluded that he

12

knowingly assisted the person who committed the crime, or was ready and willing to do so and the person who committed the crime knew of that willingness. Id. at 19. According to the respondent, "the jury reasonably could have inferred that [the petitioner] arranged for a getaway driver," that he "was ready and willing to assist Kennedy in his commission of the crime of second-degree reckless homicide and that Kennedy knew of [the petitioner's] willingness." Id. at 19-20. The respondent stresses that "the second-degree reckless homicide statute does not require that the actor be subjectively aware that his conduct would *cause* the victim's death, only that the actor be subjectively aware that his conduct created an unreasonable and substantial risk of death." Id. at 21 (emphasis in original) (citing Neumann, 348 Wis. 2d at 520). The respondent maintains that the petitioner "did not need to know that Kennedy's reckless conduct would cause Alexander's death for him to know that Kennedy was committing the crime of second-degree reckless homicide." Id. The respondent asserts that the jury reasonably could have inferred that the petitioner knew that Kennedy's conduct created an unreasonable and substantial risk of death. Id. at 22.

      The Wisconsin Court of Appeals identified and reasonably applied United States Supreme Court precedent controlling an insufficiency of the evidence claim. The jury had sufficient evidence to support its verdict. Wis. Stat. §940.06(1) defines second-degree reckless homicide as recklessly causing the death of another human being. Under Wis. Stat. §939.24, "'criminal recklessness' means that the actor creates an unreasonable and substantial

13

risk of death or great bodily harm to another human being and the actor is aware of that risk."

A rational trier of fact could conclude beyond a reasonable doubt that the petitioner recklessly caused the death of Alexander. A rational trier of fact could conclude that the petitioner either created an unreasonable and substantial risk of death or great bodily harm that caused the death of Alexander and was aware of that risk, or aided and abetted Kennedy's creation of an unreasonable and substantial risk of death or great bodily harm that caused the death of Alexander and was aware of that risk when (1) the petitioner traveled to Alexander's apartment building with Kennedy, (2) was inside the building—as was Kennedy—when someone fatally shot Alexander within the one-minute period after Alexander let the petitioner and Kennedy into Alexander's apartment building, (3) surveillance video showed Kennedy holding a gun while exiting the building with the petitioner, (4) officers recovered the petitioner's cell phone at the scene of the shooting, and (5) the petitioner and Kennedy traveled to and from Alexander's apartment building in an SUV that—according to witnesses—the petitioner had access to. It is not this court's role to second-guess the jury's determinations as to the reliability or credibility of the evidence. It is this court's role to examine whether the Wisconsin Court of Appeals unreasonably applied United States Supreme Court precedent regarding the sufficiency of the evidence. It did not.

### III. Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotations omitted). The court declines to issue a certificate of appealability, because reasonable jurists could not debate the court's decision to deny the petition on the merits.

### IV. Conclusion

The court **DISMISSES** the petition for writ of *habeas corpus*. Dkt. No. 1.

The court **DECLINES TO ISSUE** a certificate of appealability.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 30th day of November, 2021.

BY THE COURT:

_____
HON. PAMELA PEPPER
Chief United States District Judge